## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| INVENTIO AG, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | C.A. No. 1:08-cv-00874-RGA |
| ) | |
| THYSSENKRUPP ELEVATOR AMERICAS ) | |
| CORPORATION, THYSSENKRUPP ) | |
| ELEVATOR CORPORATION, and ) | |
| THYSSENKRUPP ELEVATOR ) | |
| MANUFACTURING INCORPORATED, ) | |
| ) | |
| Defendants. ) | |
| ) | |

Donald E. Reid, Esquire, Morris, Nichols, Arsht & Tunnell, LLP; and Pierre R. Yanney, Esquire and Stephen Underwood, Esquire, Stroock & Stroock & Lavan LLP, Attorneys for Plaintiff Inventio AG

James Michael Lennon, Esquire, Womble Carlyle Sandridge & Rice PLLC; and David E. Schmit, Esquire, Frost Brown Todd LLC, Attorneys for Defendants

### REPORT AND RECOMMENDATION ON DEFENDANTS' MOTION TO RECLASSIFY AS NON-CONFIDENTIAL INFORMATION DESIGNATED BY PLAINTIFF AS HIGHLY CONFIDENTIAL AND/OR LIMITED MODIFICATION OF THE PROTECTIVE ORDER

Collins J. Seitz, Jr., Special Master

On November 21, 2008, Inventio AG ("Inventio") filed suit against ThyssenKrupp Elevator Americas Corporation, ThyssenKrupp Elevator Corporation, and ThyssenKrupp Elevator Manufacturing Incorporated (collectively "ThyssenKrupp") for infringement of United States Patents Nos. 6,892,861 and 6,935,465. While discovery was ongoing, the Court granted summary judgment against Inventio on all claims, and entered judgment against Inventio on August 4, 2010. Inventio appealed to the United States Court of Appeals for the Federal Circuit. On June 15, 2011, the Federal Circuit reversed, and remanded the case for further proceedings. The parties are now concluding discovery, and have raised a discovery dispute with the Special Master.

## I.    BACKGROUND OF THE DISPUTE

ThyssenKrupp intends to file requests with the United States Patent & Trademark Office ("USPTO") to reexamine the two patents-in-suit.  As part of its submission to the USPTO, ThyssenKrupp wants to include certain information from the present litigation, which Inventio has designated as Highly Confidential under the Protective Order.  Because Inventio opposes the public disclosure of information subject to the Protective Order, ThyssenKrupp has filed a Motion to Reclassify as Non-Confidential Information Improperly Designated by Plaintiff as Highly Confidential and/or For Limited Modification of the Protective Order.  (D.I. 197). ThyssenKrupp asks the Court to (1) declassify some or all of the information as non-confidential; or (2) modify the Protective Order so that some or all of the information can be submitted to the USPTO under seal in accordance with the procedures of Section 724.02 of the Manual for Patent Examining Procedure ("MPEP").

Of the original thirty four categories of information, thirty one remain in dispute.[1]  Of those, thirty are excerpts from deposition transcripts of Inventio's 30(b)(6) witnesses Paul Friedli (employee of Inventio and named inventor of the patents-in-suit), Nicole Saloio (manager of destination products at Schindler Elevator Corporation), and Andreas Gaussmann (patent attorney and vice director of Inventio).  The remaining Category is a page which ThyssenKrupp argues comes from the prosecution file in the Singapore patent office (Category 31).

### A.    The Protective Order

The Protective Order limits disclosure of material designated "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEY EYES ONLY" to certain individuals.  (D.I. 30 at ¶¶2.2-2.5).  Under the Protective Order, any party or third party may designate the following "non-public documents, materials or information" as "CONFIDENTIAL" (*id*. at ¶1.2(a)):

  (i)     Customer proposals, bids or contracts for completed projects, exclusive of financial information; and

  (ii)    Document retention policies.

---

[1]    Inventio has agreed to declassify Categories 8 and 18.  (Plaintiff Inventio AG's Opposition To Defendants' Motion To Reclassify And/Or For Limited Modification Of The Protective Order ("Opp. Br.") at 5, 8).  In addition, the dispute over Category No. 34 is now moot, because the portions of Plaintiff's Brief in Opposition to Defendants' Motion for Leave to File First Amended Answer and Counterclaim that ThyssenKrupp seeks to declassify have already been placed in the public domain by Inventio when it filed the redacted version of its brief.  (D.I. 52 at 16).

Similarly, any party or third party may designate the following "non-public documents, materials or information" as "HIGHLY CONFIDENTIAL – ATTORNEY EYES ONLY" (*id*. at ¶1.2(b)):

(i)      Business plans, decisions and/or processes;

(ii)     Organizational charts;

(iii)    License agreements;

(iv)     Financial or marketing information;

(v)      Technical documents, drawings and information, including but not limited to engineering drawings, sketches, notes, lab notebooks, schematic diagrams, blueprints, structured software diagrams, block diagrams, flowcharts, source code, object code, data flow and timing diagrams, technical documents, specifications, installation and service manuals;

(vi)     Computer software;

(vii)    Non-public documents, materials or information relating to suppliers;

(viii)   Non-public documents, materials or information, including proposals, bids or contracts, relating to present or prospective customers, dealers and distributors;

(ix)     Non-public patent applications;

(x)      Non-public research, including research regarding competitors;

(xi)     Internal studies, comparison analyses, testing and evaluations of products and services;

(xii)    Non-public market share data;

(xiii)   Employee information;

(xiv)    Board and committee meeting notes and minutes;

(xv)     Sales projections, profit projections, market share projections, pricing plans and pricing analysis;

(xvi)    Customer proposals, bids or contracts for projects that have not been completed;

(xvii)   Other information the receiving party would not have access to but for this lawsuit, and the disclosure of which is likely to cause serious injury to the competitive position of the producing party.

According to Paragraph 1.3(e) of the Protective Order, only information expressly falling within the categories listed in paragraph 1.2(a) or (b) can be designated and protected under the Protective Order.  (*Id*. at ¶1.3(e)).

Information that has been designated Highly Confidential may only be disclosed to outside counsel and their employees, independent consultants or experts, the Court, court reporters, professional vendors, and persons who are authors or recipients of the information.

(*Id*. at ¶2.2). Information designated Confidential may only be disclosed to the individuals identified above, and persons or parties "whom disclosure is reasonably necessary" for this litigation and who signed an "Agreement to Be Bound by Protective Order." (*Id*. at ¶2.3).

Paragraph 3 of the Protective Order governs challenges to confidentiality designations, and sets forth a procedure by which the challenging party provides written notice of its objections and the designating party has ten days to either remove the designation or explain why it continues to maintain the designation in good faith. (*Id*. at ¶3.1). The parties are to "endeavor in good faith to resolve any such dispute without calling upon the intervention of the Court," but if the parties are unable to reach agreement, "the challenging party may bring the issue to the attention of the Court." (*Id*. at ¶3.2). In such a circumstance, "[t]he party asserting confidentiality shall have the burden of establishing the appropriateness of the designation, except that a party claiming that information designated by the other as confidential is in the public domain shall have the burden of proving such public knowledge." (*Id*.)

The terms of the Protective Order may be modified "by further Order of the Court, or by agreement of the parties or their counsel and approved by the Court." (*Id*. at ¶8.3).

## B.     The Reexamination Process

ThyssenKrupp intends to initiate an *ex parte* reexamination of the patents-in-suit. (Oral Argument Tr. at 41-42). In an *ex parte* reexamination, the USPTO reexamines an issued patent "according to the procedures established for initial examination" to confirm that the subject matter it claims is patentable over the prior art. 35 U.S.C. § 305. *Ex parte* reexaminations are primarily between the patent owner and the USPTO, but can be initiated by any member of the public. Although third parties like ThyssenKrupp can request an *ex parte* reexamination, they are generally not allowed to participate in the proceedings. *See* 37 C.F.R. § 1.550(g).

There are two stages to a reexamination. In the initial stage, the Director of the USPTO reviews the submitted prior art and determines whether to grant a request for reexamination of a particular patent. *See* 35 U.S.C. §§ 302-03. A request for reexamination will only be granted if the submitted prior art is found to raise a "substantial new question of patentability." 35 U.S.C. § 303. If the request is granted, the substantive stage begins, during which the identified patent is reexamined to determine its validity. *See* 35 U.S.C. §§ 304-05. As discussed below, the parties dispute the types of information that may be submitted and considered during an *ex parte* reexamination.

## C.     Submission of Confidential Materials to the USPTO

The USPTO has a procedure for submitting "material subject to a protective order" under seal. MPEP § 724.02. Materials submitted pursuant to MPEP § 724.02 in a reexamination proceeding "will be sealed from public view" and will "not be publicly available until a determination has been made as to whether or not the information is material to patentability." MPEP § 724.04(c)(A). Specifically, "[t]he examiner, or other appropriate Office official who is responsible for considering the information, will make a determination as to whether or not any portion or all of the information submitted is 'material to patentability.'" MPEP § 724.04(b)(C). "[I]nformation is material to patentability when it is not cumulative to information already of

record . . . and (1) [i]t establishes, by itself or in combination with other information, a *prima facie* case of unpatentability of a claim; or (2) [i]t refutes, or is inconsistent with, a position the applicant takes." 37 C.F.R. § 1.56(b). "If any portion or all of the submitted information is found 'to be material to patentability,'" the information will be opened to the public. MPEP § 724.04(c)(C). If the submitted information is found *not* to be material to patentability, the information will not be made public. MPEP § 724.04(c)(D). In deciding whether to make the submitted information public, the USPTO does not determine whether the information was properly designated as confidential information.

## II.   LEGAL STANDARD

### A.   Challenges to Designations

Challenges to confidentiality designations made pursuant to the Protective Order are in the first instance governed by the provisions of the Protective Order itself. *See Medicines Co. v. Teva Parenteral Medicines, Inc*., 2011 WL 3290291, at *6-8 (D. Del. June 30, 2011) (applying the dispute provisions of the protective order in dispute concerning the propriety of confidential designations). Paragraph 3.1 provides that any party believing that particular information has been improperly marked as Confidential or Highly Confidential "may challenge such designation at any time by raising the issue, in writing to the designating party, and specifically identifying . . . the information whose confidentiality status is challenged. Within ten business days of receipt of such writing, the designating party shall either remove or reduce the designation, or respond that it has reviewed the matter and continues to maintain the designation in good faith." (D.I. 30 at ¶3.1). The parties are to "endeavor in good faith to resolve any such dispute without calling upon the intervention of the Court," but if the parties are unable to reach agreement, "the challenging party may bring the issue to the attention of the Court." (*Id*. at ¶3.2).[2] In such a circumstance, "[t]he party asserting confidentiality shall have the burden of establishing the appropriateness of the designation, except that a party claiming that information designated by the other as confidential is in the public domain shall have the burden of proving such public knowledge." (*Id*.).

---

[2]    Pursuant to Paragraph 3.1 of the Protective Order, ThyssenKrupp advised Inventio of its plans to submit a petition for reexamination on August 13, 2012, and requested that Inventio either (1) declassify some or all of the information so that it is not subject to the Protective Order; and/or (2) stipulate that some or all of the information may be submitted to the USPTO under seal in accordance with the procedures of MPEP § 724.02. (D.I. 199 at A1-2). On August 17, 2012, Inventio responded that it would not agree to declassify the information or modify the Protective Order. (*Id*. at A22-24). On August 28, 2012, ThyssenKrupp provided Inventio with a draft of its motion and again asked Inventio whether it would agree to declassify the information or modify the Protective Order, however, Inventio did not substantively respond or make any other attempt to resolve this dispute. (*Id*. at A25). Under these circumstances the Special Master finds that ThyssenKrupp has met the meet and confer requirements of Paragraph 3.2 of the Protective Order, and that the issue is ripe for resolution.

5

Inventio has the burden of demonstrating that "good cause" exists to maintain protection of its information.  *See Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 786-87 (3d Cir. 1994).  "'Good cause is established on a showing that disclosure will work a clearly defined and serious injury to the party seeking closure.'"  *Id*. at 786 (quoting *Publicker Indus., Inc. v. Cohen*, 733 F.2d 1059, 1071 (3d Cir. 1984)).  "'Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning,' do not support a good cause showing."  *Id*. (quoting *Cipollone v. Liggett Grp., Inc.*, 785 F.2d 1108, 1121 (3d Cir. 1986)).

## B.    Modification of Protective Order

In paragraph 2.1 of the Protective Order, the parties stipulated that information subject to the Protective Order would be used solely for the preparation, prosecution, and trial of this case and for no other purpose.  (D.I. 30 at ¶2.1).   For any documents that remain subject to the Protective Order, ThyssenKrupp has requested that the Court modify the Protective Order to allow ThyssenKrupp to use Protected Material in the contemplated reexamination proceeding. (D.I. 198 at 5-12).

The terms of the Protective Order may be modified "by further Order of the Court, or by agreement of the parties or their counsel and approved by the Court."  (D.I. 30 at ¶8.3).  As stated in *Phillips Petroleum Co. v. Rexene Products Co*., 158 F.R.D. 43, 46 (D. Del. 1994), "courts have discretionary authority to modify a stipulated protective order. . . ."  ThyssenKrupp bears the burden of demonstrating that the Protective Order should be modified.  *Id*.

The Third Circuit has held that "[t]he party seeking to modify the order of confidentiality must come forward with a reason to modify the order."  *Pansy*, 23 F.3d at 790.  "Once that is done, the court should then balance the interests, including the reliance by the original parties to the order, to determine whether good cause still exists for the order."  *Id*.  The *Pansy* court set forth a series of non-exclusive factors that may be considered in evaluating whether "good cause" exists:   (1) whether disclosure will violate any privacy interests; (2) whether the information is being sought for a legitimate purpose; (3) whether disclosure will cause embarrassment to a party; (4) whether the information to be disclosed is important to public health or safety; (5) whether sharing the information among litigants will promote fairness and efficiency; (6) whether the party benefitting from the order is a public entity or official; (7) whether the case involves issues important to the public; and (8) the reliance by the original parties on the confidentiality order.  *Id*. at 787-91.  These factors, however, are "neither mandatory nor exhaustive."  *Glenmede Trust Co. v. Thompson*, 56 F.3d 476, 483 (3d Cir. 1995).

After weighing the factors, "the Court 'must balance [the requesting party's] need for information against the injury that might result if uncontrolled disclosure is compelled.'"  *Crum & Crum Enters., Inc. v. NDC of California, L.P.*, 2011 WL 886356, at *2 (D. Del. March 10, 2011) (quoting *Pansy*, 23 F.3d at 787).

## III.   ANALYSIS

### A.   WHETHER THE INFORMATION WAS PROPERLY DESIGNATED AS HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER

The first step in resolving this dispute is to examine whether Inventio has met its burden of demonstrating that the information was properly designated as Highly Confidential under the Protective Order.  (D.I. 30 at ¶3.2 ("[t]he party asserting confidentiality shall have the burden of establishing the appropriateness of the designation")).  Not surprisingly, the parties dispute what types of information can be designated as Highly Confidential.

As previously discussed, the Protective Order allows any party to designate the following two types of information as "Confidential":  "(i) Customer proposals, bids or contracts for completed projects, exclusive of financial information; and (ii) Document retention policies." (D.I. 30 at ¶1.2(a)).  Inventio argues that "[**a]ll other** types of confidential information, including the catchall '(xvii) Other information the receiving party would not have access to but for this lawsuit,' are to be designated **Highly Confidential**."  (Opp. Br. at 3) (emphasis in original). Inventio further asserts that the "parties specifically bargained for" and the "Court approved" this treatment of information.  (*Id.*)

The Special Master disagrees that all non-public information not specifically identified as Confidential under paragraph 1.2(a) of the Protective Order is automatically deemed Highly Confidential.  When this case was specially assigned to Judge Robreno, he ruled otherwise.

The parties originally submitted the proposed protective order for Court approval on March 27, 2009.  (D.I. 22).  Paragraph 1.2(b) defined "Highly Confidential" material broadly (*id.* at ¶1.2(b)):

> [M]aterials [that] the [designating] party reasonably and in good faith believes to contain particularly sensitive technical information relating to research for and production of current products; technical, business, and research information regarding future products; non-public and highly sensitive financial information; marketing and sales information, such as marketing plans and forecasts, customer lists, pricing data, cost data, customer orders, and customer quotations; any pending or abandoned patent applications, foreign or domestic; and such other documents, information, or materials that relate to other proprietary information that the designating party reasonably believes is of such nature and character that disclosure of such information would be harmful to the designating party.

On March 31, 2009, the Court denied the proposed protective order, ruling that it "fails to meet the good cause requirements set forth in Federal Rule of Civil Procedure 26(c). Specifically, the parties must identify, individually or by category of documents, which documents will be marked confidential and, as to each document or set of documents, explain why the documents should be so designated."  (D.I. 25).  Judge Robreno allowed the parties to resubmit a proposed protective order that "adheres closely to the principles set forth by the Third

Circuit in *Pansy v. Borough of Stroudsburg*, 23 F.3d 772 (3d Cir. 1994)."  (*Id.*)

The parties resubmitted the proposed Protective Order on May 5, 2009.  Judge Robreno entered the parties proposed order that same day, after making one important change in his own handwriting:  he added Paragraph 1.3(e) to the Protective Order, which states that "[a]ll information" not specifically "listed in 1.2(a) [or] (b)" "shall not be designated or protected under this Protective Order."  (D.I. 30 at 4).

In other words, Judge Robreno made clear that if non-public information does not fall within the two categories identified in Paragraph 1.2(a), it is not automatically assumed to be Highly Confidential.  Rather, to be considered Highly Confidential, the information must fall into one of the specific categories of Paragraph 1.2(b)(i) through (xvii), or meet the two specific requirements of the "catchall" category (¶1.2(b)(xvii)): (1) it is information that "the receiving party would not have access to but for this lawsuit"; and (2) the disclosure of this information is "likely to cause serious injury to the competitive position of the producing party."

Against this backdrop, the Special Master reviews each of the thirty one categories at issue to determine whether Inventio properly designated them as Highly Confidential pursuant to the Protective Order:

Category 1:  As Inventio explains, the information in this category concerns "who wrote the European priority applications for the Patents-in-Suit" over a decade ago.  (Opp. Br. at 3) (emphasis added).  This is not the type of information covered by Paragraph 1.2(b)(ix), which is limited to "[n]on-public patent applications" and not "non-public information about [public] patent applications" as Inventio asserts.  (*Id.* (emphasis added)).  It also does not fall into the "catchall" category because Inventio fails to identify how it would be harmed should this historical information be disclosed to the public.  *See Procter & Gamble Co. v. Nabisco Brands, Inc.*, 111 F.R.D. 326, 331 (D. Del. 1986) (finding good cause did not exist because party seeking to maintain protection "has not shown that disclosure of this old information at this time will harm it").  Indeed, Inventio conceded at oral argument that this type of information is "fairly low on the scale of confidentiality."  (Oral Argument Tr. at 25:16-21).  Thus, this information was not properly marked as Highly Confidential under the Protective Order.

Category 2:  This information is taken from the deposition of Paul Friedli (named inventor of the patents-in-suit and Inventio's Rule 30(b)(6) witness).  Inventio asserts that in these excerpts, "Dr. Friedli specifically discusses Inventio's sensitive, non-public R & D efforts that ultimately led to the Patents-in-Suit," and thus this information is covered by Paragraphs 1.2(b)(v) (non-public technical information of Inventio), (x) ("[n]on-public research, including research regarding competitors"), and (xi) (non-public information about Inventio's "[i]nternal studies . . . testing and evaluations") of the Protective Order.  (Opp. Br. at 4).  Contrary to Inventio's assertions, however, there is no reference in these deposition excerpts to Inventio's "R & D efforts."  At most, these excerpts reveal the problems that Dr. Friedli was trying to address with his invention over a decade ago and the general awareness of others of such problems.  Such information is not Highly Confidential.  As ThyssenKrupp's supplemental briefing shows, during the reexamination of Inventio's U.S. Patent No. 5,689,094 ("the '094 patent"), Inventio submitted a declaration from Dr. Friedli in which he disclosed similar facts concerning the problems that he has trying to solve with the invention disclosed in the '094

patent.  (*See, e.g.*, D.I. 226, Ex. A at 71 ("The inability of the elevator control system to be tailored to the individual was a problem with the Miconic 10. . . As a solution to this problem, I envisioned a personalization of elevator control, which would involve implicit elevator calls, including personalized information about the elevator users, while maintaining the speed of desired floor entry previously available.")).  This information (which Inventio disclosed to the public) is almost indistinguishable from the information that Inventio seeks to keep confidential here.

Category 3:  In these excerpts, Dr. Friedli was asked what he believed to be new in the patents-in-suit and what he understood certain terms of the patent to mean.  Although Dr. Friedli could have answered these questions in a way that did not reveal protected information, Dr. Friedli's answers revealed "non-public technical features of Inventio's products embodying the Patents-in-Suit" and "Inventio's internal findings on customer reactions of those products." (Opp. Br. at 4).  For instance, Dr. Friedli discussed a specific study that Inventio performed testing how its customers adapted to the patented technology.  (D.I. 199 at A36:24-A37:11).  As such, this information is protected at least under Paragraphs 1.2(b)(xi) (non-public information about Inventio's "[i]nternal studies . . . testing and evaluations") and (v) (non-public technical information of Inventio) of the Protective Order.

Category 4:  Inventio asserts that this category contains confidential information concerning when the inventor "came up with the idea" contained in the patents-in-suit.  Such information is not the type of technical documents; research; or internal studies, testing or evaluation covered by Paragraphs 1.2(b)(v), (x) and (xi) of the Protective Order.  Indeed, Inventio publically submitted similar facts to the USPTO during the reexamination of the '094 patent.  (*See, e.g.*, D.I. 226, Ex. A at 53 ("In 1994, Dr. Friedli invented his elevator control system")).  According to Inventio, Dr. Friedli also describes "Inventio's internal conclusions as to the advantages of its products."  (Opp. Br. at 4).  The fact that the commercially available Miconic 10 improves elevator capacity, however, is not secret, non-public information.  Indeed, this fact was discussed in the publically available article attached to ThyssenKrupp's Reply Brief (*See* D.I. 201 at A151 (stating that the Miconic 10 "assesses the weight capacity of each car in order to prevent it from stopping for passengers once it is already full" and "distributes traffic to all of the elevators' cabs and groups guests in front of their assigned elevator prior to arrival" which results in a reduction of "the number of elevators missed by guests")).  This information was not properly marked as Highly Confidential pursuant to the Protective Order.

Category 5:  Inventio asserts that this deposition excerpt concerns "when [Dr. Friedli] 'came up with the idea that's in the '465 patent.'"  (Opp. Br. at 5).  As discussed previously, when the inventor came up with the idea of the invention is not Highly Confidential information under the Protective Order.  Inventio also claims that this excerpt contains "technical information about Schindler's products" that is protected under Paragraphs 1.2(b)(v) (non-public technical information of Inventio), (x) ("[n]on-public research, including research regarding competitors"), and (xi) (non-public information about Inventio's "[i]nternal studies . . . testing and evaluations") of the Protective Order.  This excerpt, however, does not mention secret technical information about Schindler's products.  Rather, it focuses on Dr. Friedli's assessment of what information disclosed in the Patents-in-Suit was in the prior art, and the source of certain nomenclature used in the patents.  As such, this information is almost indistinguishable from the information in Category 8 (Dr. Friedli's admissions concerning whether the "computer program product"

described in the Patents-in-Suit and "destination control" were known in the prior art), which Inventio admits does "not appear to contain confidential information, and therefore may be declassified." (Opp. Br. at 5). This information was not properly marked as Highly Confidential pursuant to the Protective Order.

Categories 6 and 11: As Inventio admits, the only potentially confidential information contained in these categories concerns "what [Dr. Friedli] came up with in [his] patent." (Opp. Br. at 5-6). This information is not "non-public" as Inventio asserts. The basic *quid pro quo* of the patent system contemplated by the Constitution and Congress is that the inventor must disclose to the public "what" he or she invented in exchange for the right to exclude. *See Brenner v. Manson*, 383 U.S. 519, 534-35 (1966). Thus, this information does not fall into the protected information outlined in Paragraphs 1.2(b)(v) (non-public technical information of Inventio), (x) ("[n]on-public research, including research regarding competitors"), and (xi) (non-public information about Inventio's "[i]nternal studies . . . testing and evaluations") of the Protective Order.

Category 7: In this excerpt, Dr. Friedli discusses his knowledge of "anyone who had used an overlay in connection with a destination control type system." (Opp. Br. at 5). Dr. Friedli, however, never mentions any "secret" information of Inventio or Schindler.[3] As ThyssenKrupp notes, Dr. Friedli simply mentions the "historical fact of the use of overlays in the public prior art," which is not protectable under Paragraphs 1.2(b)(v), (x) and (xi) of the Protective Order. (D.I. 200 at 2).

Category 9: The information in this category concerns who drafted the Swiss priority document for the patent-in-suit (over ten years ago), and the historical fact that this attorney was employed by an undisclosed law firm at that time. This information is neither a "non-public patent application" nor "employee information." As discussed in Category 1, *supra*, the harm to Inventio if the public knows who wrote the priority application over a decade ago is quite low, as Inventio admits. (*See* Oral Argument Tr. at 25:16-21 (stating that this type of information is "fairly low on the scale of confidentiality")); *see also Procter & Gamble*, 111 F.R.D. at 331 (finding good cause did not exist because party seeking to maintain protection "has not shown that disclosure of this old information at this time will harm it"). Also, the historical fact that this attorney worked for a law firm is undoubtedly public knowledge. This information was not properly marked as Highly Confidential pursuant to the Protective Order.

Categories 10 and 13: Inventio argues that these excerpts contain "Inventio's sensitive, non-public R & D efforts that ultimately led to the Patents-in-Suit" and "Inventio's internal, non-public understanding of customer and industry views of destination dispatch technology," and thus they are covered by Paragraphs 1.2(b)(v) ("non-public technical information of Inventio"), (x) ("non-public information about Inventio's research") and (xi) ("non-public information about Inventio 'internal studies . . . testing and evaluations'") of the Protective Order. (Opp. Br. at 6-

---

[3]     According to Schindler's website it is public knowledge that overlays can be used with Schindler's Miconic 10. *See* http://www.schindler.com.sa/uae-mod-overlay ("Schindler ID Mod Overlay converts the existing lift control system so that our Miconic 10 technology can be readily integrated").

7).  On their face, these excerpts do not discuss non-public technical information, research or any internal study, and Inventio has not met its burden to show otherwise.  To the extent that Inventio argues that the information is <u>derived from</u> such research and internal studies, a plain reading of the Protective Order dictates that such information is not protected if it does not reveal the existence of such research or studies.  Indeed, the parties knew how to cover information <u>related to</u> a particular subject matter in the Protective Order, but decided against providing protections for information <u>relating to</u> research and internal studies.  *Compare* D.I. 30 at ¶1.2(b)(vii) (protecting non-public documents "<u>relating to</u> suppliers") *to* ¶1.2(b)(x) (protecting "[n]on-public research," but not information <u>relating to</u> such research).  This information was not properly marked as Highly Confidential pursuant to the Protective Order.

Category 12:  Inventio claims that in these excerpts, "Dr. Friedli discusses Inventio's sensitive, non-public R & D efforts that ultimately led to the Patents-in-Suit."  (Opp. Br. at 6).  However, the inventor's discussion of the predictability of the invention and the state of the art in at the time of the invention does not reveal Inventio's non-public technical, research or internal testing information, and the disclosure of this historical information could not harm Inventio.  This information was not properly marked as Highly Confidential pursuant to the Protective Order.

Category 14:  Inventio asserts that in this excerpt "Dr. Friedli discusses non-public technical features of Schindler's Miconic 10 and other products."  (Opp. Br. at 7).  ThyssenKrupp responds that the excerpt simply contains the "inventor's admission that elements of the 'inventions' claimed in the patents-in-suit were in publically available prior art (specifically the commercially available Miconic 10 product)," which is not covered by the Protective Order.  (D.I. 200 at 3).  The Special Master agrees with Inventio that this information falls into the protected information described in Paragraph 1.2(b)(v) of the Protective Order (non-public technical information).  ThyssenKrupp points to no evidence that the technical information discussed is in the public domain.  *See* D.I. 30 at ¶3.2 (ThyssenKrupp as the "party claiming that information designated by the other as confidential is in the public domain," has the burden to prove "such public knowledge").  Moreover, just because the product may be prior art does not mean that technical information about the product is public knowledge.

Category 15:  In these excerpts, Dr. Friedli is asked whether a particular statement that was made in the publically available prosecution history of one of the patents-in-suit (of which he is the named inventor) is true.  This is not the type of non-public technical information, research information, and internal studies covered by the Protective Order.

Category 16:  In this excerpt, Dr. Frieldi discusses the historical fact of whether overlays were commonly used by third parties in the elevator industry from 1984 to 1995, and identifies a third party overlay company that Schindler worked with during that time period.  There is nothing in this excerpt discussing Schindler's understanding "of the market for 'overlays'" as Inventio asserts, and even if there was, it would not be the type of non-public technical or research information, internal studies, testing or evaluation covered by Paragraphs 1.2(b)(x) or (xi) of the Protective Order.  (D.I. 200 at 3).  Additionally, the mere identification of a company that Schindler worked with over two decades ago does not reveal any non-public "documents, materials or information" about its suppliers that would be covered under Paragraph 1.2(b)(vii), and Inventio would not be harmed by the disclosure of this historic information.  *See Procter &*

*Gamble*, 111 F.R.D. at 331 (finding good cause did not exist because party seeking to maintain protection "has not shown that disclosure of this old information at this time will harm it").

Category 17:   In this excerpt, Dr. Friedli is asked whether a statement about the prevalence of "overlay modernization" in a 1990 publically available article is true.  This excerpt reveals nothing about Inventio's or Schindler's technical information, research information, or internal studies, and Inventio would not be harmed by Dr. Friedli's acknowledgement of this decades old statement.

Categories 19 and 20:   According to Inventio, in these excerpts Nicole Saloio discusses "non-public technical and marketing information about Schindler's 'phased modernization' products" and "non-public information about Schindler's assessment of the benefits of phased modernization," and argues that these thus fall into the information protected by Paragraphs 1.2(b)(iv) (non-public marketing information), (v) (non-public technical information) and (x) ("[i]nternal studies . . . testing and evaluations) of the Protective Order.  (Opp. Br. at 8).  On their face, these excerpts do not discuss non-public marketing information, technical information or any internal study, and Inventio has not met its burden to show otherwise.  As noted for Categories 10 and 13, *supra*, to the extent that Inventio argues that the information is derived from such marketing research or internal studies, a plain reading of the Protective Order dictates that such information is not protected if it in no way reveals the such research or studies. *Compare* D.I. 30 at ¶1.2(b)(vii) (protecting non-public documents "relating to suppliers") *to* ¶1.2(b)(iv) (protecting "[f]inancial or marketing information," but not information relating to such information).

Category 21:   Inventio asserts that this excerpt "reveals non-public technical and marketing information about whether Schindler has installed phased modernization jobs" with specific technical features.  (Opp. Br. at 8).  Although Inventio's and Schindler's non-public technical information would be protected by Paragraph 1.2(b)(v) of the Protective Order, the technical features discussed in this excerpt are clearly visible to elevator users.  Thus, this information is already public and not protectable under the Protective Order.  (D.I. 30 at ¶1.3 ("Information that is in the public domain at the time of disclosure" "shall not be designated or protected under this Protective Order.")).

Category 22:  In this excerpt, Nicole Saloio (manager of destination products at Schindler Elevator Corporation) discusses "variations Schindler makes to its phased modernization products to accommodate certain buildings."  (Opp. Br. at 9).  On its face, this information is protected as non-public technical information under Paragraph 1.2(v) of the Protective Order.  Indeed, ThyssenKrupp does not argue that this information is public.  Rather, it argues that the variations are "non-specific" and do not contain details such as "what voltages are used."  (D.I. 200 at 4 n.5).  The excerpt, however, contains enough specificity to be protected as non-public technical information.

Category 23:   In this excerpt, Ms. Saloio discusses specific components that were installed at a Schindler installation at the "Marriott Marquis" in New York City.  (Opp. Br. at 9, D.I. 199 at A81-85).  There is no evidence that these technical components were known to the public, and the article that ThyssenKrupp points to does not discuss these components.  Therefore, at least a portion of this information is covered by Paragraph 1.2(b)(v) of the

Protective Order as non-public technical information.

Category 24:    According to ThyssenKrupp, this testimony includes Ms. Saloio's description of Schindler's "sales strategy" for "Schindler's commercial product Schindler ID" and describes "how Schindler was marketing its products to customers."  (D.I. 198 at 5; D.I. 200 at 5).  Thus, by ThyssenKrupp's own description, this information falls squarely into Paragraphs 1.2(b)(i) (business plans, decisions and/or processes) and 1.2(b)(iv) (financial or marketing information).   ThyssenKrupp's assertion that Schindler stopped using this marketing approach "at least by 2010" is of little significance.  (D.I. 200 at 5).  Specifically, Paragraphs 1.2(b)(i) and (iv) are not limited to present or prospective customers as ThyssenKrupp asserts.  Moreover, the excerpted testimony describes Schindler's current sales strategy and how it has changed over the years.  (D.I. 199 at A87).

Category 25:    In these excerpts, Ms. Saloio describes the reaction of "potential customers" to the phased modernization, instances where Schindler lost bids on a phased modernization job, and the reasons for such loss.   The questions and answers specifically targeted to "potential customers" are covered under Paragraph 1.2(b)(viii) as non-public information, including bids or proposals, that relate "to present or prospective customers." Additionally, the Protective Order specifically protects "[c]ustomer proposals, bids or contracts," regardless of whether the party that submitted the bid actually won the job.  If the bid is "for projects that have not been completed," it is protected under Paragraph 1.2(b)(xvi) as Highly Confidential and if the bid is "for completed projects" it is protected under Paragraph 1.2(a)(i) as Confidential.  There is no information in the record concerning whether the particular bids discussed in these excerpts were for completed or uncompleted projects.  Regardless, the Protective Order in its current form forbids such information from being submitted to a third party, such as the USPTO.  (D.I. 30 at ¶¶2.2 and 2.3).

Category 26:   Inventio asserts that this excerpt reveals "non-public information about Inventio patent applications, including sensitive, non-public information about the strategy and drafting of the European priority applications for the Patents-in-Suit."   (Opp. Br. at 10). However, the fact that over ten years ago a particular person wrote the priority applications for the patents-in-suit reveals nothing about Inventio's "strategy."  Additionally, this information is not covered by Paragraph 1.2(b)(ix), which only protects "[n]on-public patent applications" and not "non-public information about" public patent applications as Inventio suggests.  (Id.).  Nor is it protected under Paragraph 1.2(b)(xi) because it reveals nothing about any "internal study" performed by Inventio.   This information was not properly marked as Highly Confidential pursuant to the Protective Order.

Category 27:   In this excerpt, Dr. Gaussmann discusses when the European priority applications for the Patents-in-Suit were drafted and when he met with the inventor.   This information does not fall into the protected information in Paragraph 1.2(b)(ix), which is limited to "[n]on-public patent applications," nor Paragraph 1.2(b)(xi) because it reveals nothing about any "[i]nternal studies" performed by Inventio.  This information was not properly marked as Highly Confidential pursuant to the Protective Order.

Category 28:   In this excerpt, Dr. Gaussmann discusses who came up with the term "modernizing device" that is used in the Patents-in-Suit.  The excerpt reveals nothing about the

substance of any meetings or discussions among Inventio and its attorneys, and does not mention a non-public patent application or internal study.  The information is not Highly Confidential pursuant to Paragraphs 1.2(b)(ix) or (xi) of the Protective Order.

Category 29:  This excerpt contains Dr. Gaussmann's opinion concerning the "core" of the invention described in the Patents-in-Suit.  Contrary to Inventio's arguments, there is nothing in this excerpt that reveals "Inventio's non-public business decisions regarding how it decides to pursue particular patents."  (Opp. Br. at 10).  This information is not a "[b]usiness plan [or] decision," a "[n]on-public patent application" nor an "[i]nternal stud[y]" protected by Paragraphs 1.2(b)(i), (ix) or (xi) of the Protective Order.

Category 30:  According to Inventio, in this excerpt "Dr. Gaussmann reveals his and/or Inventio's internal, technical findings and conclusions as to how long 'destination control' has been known."  (Opp. Br. at 11).  This information is almost indistinguishable from the information in Category 8 (containing Dr. Friedli's statement that "destination control was very well known in the industry" at the time the applications for the Patents-in-Suit were filed (D.I. 199 at A52)), which Inventio admits does "not appear to contain confidential information, and therefore may be declassified."  (Opp. Br. at 5).  Thus, this information does not fall into the protected information outlined in Paragraphs 1.2(b)(v) (technical information of Inventio), (x) ("[n]on-public research . . . regarding competitors") or (xi) ("[i]nternal studies") of the Protective Order.

Category 31:  Inventio characterizes this document as "one page from Inventio's internal draft submission to the Singapore Patent Office" that came from "its own internal patent prosecution files."  (Opp. Br. at 11).  ThyssenKrupp responds that there is "no evidence" that the document is a draft and that the document was produced "in response to a document request that asked for documents that were submitted to foreign patent offices."  (Oral Argument Tr. at 32:2-16).  Paragraph 3.2 of the Protective Order places the burden on ThyssenKrupp, as the "party claiming that information designated by the other as confidential is in the public domain," to prove "such public knowledge."  (D.I. 30 at ¶3.2).  ThyssenKrupp did little to meet its burden.  (*See* Oral Argument Tr. at 31:10-32:4).  This document therefore will be treated as a non-public patent application under paragraph 1.2(b)(ix) of the Protective Order.

Categories 32 and 33:  These are excerpts from the deposition of Dr. Friedli in a separate case, which were produced by Inventio in this case.  In these excerpts, Dr. Friedli acknowledges that he worked with a specific individual while at Schindler (without revealing anything confidential that was discussed between them) and Dr. Friedli's acknowledgement of who developed the Miconic 10 over two decades ago  (without revealing anything about the Miconic 10).  These are not the type of non-public research or employee information that are covered under Paragraphs 1.2(b)(x) and (xii) of the Protective Order, and Inventio has failed to describe how it would be harmed by the disclosure of such historical information.  *See Procter & Gamble*, 111 F.R.D. at 331 (finding good cause did not exist because party seeking to maintain protection "has not shown that disclosure of this old information at this time will harm it").

### B.   SUMMARY OF CATEGORIES THAT WERE IMPROPERLY MARKED HIGHLY CONFIDENTIAL

The Special Master concludes that the information in categories 1, 2, 4, 5, 6, 7, 9, 10, 11, 12, 13, 15, 16, 17, 19, 20, 21, 26, 27, 28, 29, 30, 32, and 33 does not meet the definition of Highly Confidential information contained in Paragraphs 1.2(b)(i)-(xvi) of the Protective Order, nor the definition of Confidential information contained in Paragraph 1.2(a) of the Protective Order.  Additionally, the information does not fall into the catch-all category in Paragraph (xviii) because Inventio has not met its burden of proving with any specificity how it would be harmed by the disclosure of this information, much less specify how it would be "seriously harmed."  Thus, Inventio has failed to make a showing under the express language of the Protective Order or even a showing that good cause exists to protect the information in these categories.  *See Pansy*, 23 F.3d at 786 ("'Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning,' do not support a good cause showing.") (quoting *Cipollone*, 785 F.2d at 1121).   Therefore, the Special Master grants ThyssenKrupp's Motion to Reclassify the information contained in these categories as non-confidential.

### C.   SUMMARY OF CATEGORIES THAT WERE PROPERLY MARKED HIGHLY CONFIDENTIAL

The Special Master concludes that Inventio properly marked the information in Categories 3, 14, 22, 23, 24, 25, and 31 as Highly Confidential under the Protective Order. ThyssenKrupp has requested that, even as to this information, the Court modify the Protective Order to allow it to use Protected Material in the contemplated reexamination proceeding.

As noted previously, ThyssenKrupp must first satisfy *Pansy*'s threshold requirement of "com[ing] forward with a reason to modify the order."  *Pansy*, 23 F.3d at 790.  "It is clear that this threshold step simply requires the moving party to state '*a reason*' for seeking modification, as the *legitimacy* of the moving party's purpose is reserved for examination under the second *Pansy* factor."  *Apeldyn Corp. v. Au Optronics Corp.*, 2012 WL 2368796, at *3 (D. Del. June 13, 2012) (emphasis in original), Special Master's report adopted at 2012 WL 2366537 (D. Del. June 20, 2012).  The Special Master finds that ThyssenKrupp has met this threshold requirement by stating that modification is necessary to allow it to submit the information as part of its reexamination request.

Next, the Special Master must "balance the interests, including the reliance by the original parties to the order, to determine whether good cause still exists for the order."  *Pansy*, 23 F.3d at 790.  In determining whether good cause exists to maintain protection of the information in Categories 3, 14, 22, 23, 24, 25, and 31, "the Court must 'balance the requesting party's need for information against the injury that might result if uncontrolled disclosure is compelled.'"  *Crum & Crum*, 2011 WL 886356, at *2.

### 1.   ThyssenKrupp's Need for the Information

#### a)   Parties' Arguments

ThyssenKrupp asserts that the disclosure of the thirty one categories of information will be important to its upcoming *ex parte* reexamination request to the USPTO, and thus *Pansy*

factors 2 (whether the information is being sought for a legitimate purpose), 6 (whether the party benefitting from the order is a public entity or official) and 7 (whether the case involves issues important to the public) weigh in favor of declassifying the information. Specifically, ThyssenKrupp asserts that factor 2 favors disclosure because it intends to use the information "in connection with having the USPTO reexamine the patentability/validity of the patents involved in the present case," and that factor 6 favors disclosure because Congress's purpose in enacting the reexamination statute, reviewing issued patents for patentability problems, is "best [] achieved if the USPTO is provided with all information relevant to determining whether the '465 and '861 patents are still valid." (D.I. 198 at 8-9). As to factor 7, ThyssenKrupp admits that the present case is between private business litigants and thus "does not *per se* involve issues important to the public." (*Id.* at 9). However, it argues that the public has a "significant public interest in purging invalid patents." (*Id.* at 9-10); *see also Blonder-Tongue Labs, Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 331 n.21 (1971) ("Patent validity raises issues significant to the public as well as to the named parties"). In order for any of these factors to be relevant, however, there must be some link between the disclosure of this information and ThyssenKrupp's ability to use it to invalidate the patents-in-suit.[4] Thus, an examination of the relevancy of this information to the proposed *ex parte* reexamination is required.[5]

The parties dispute whether the USPTO would consider this information during the reexamination process. Inventio asserts that the materials sought by ThyssenKrupp would be "utterly irrelevant" to whether to grant a request for reexamination and to the reexamination itself, and therefore the "public has nothing to gain from and, therefore, no interest in its disclosure." (Opp. Br. at 1, 13). Specifically, Inventio cites to 35 U.S.C. §§ 302 and 301(a)(1) and C.F.R. § 1.552, and argues that "the only information that the USPTO may consider" in determining whether to grant a reexamination request is "prior art consisting of patents or printed publications." (*Id.* at 15) (emphasis in original); *see also* 35 U.S.C. § 301(a)(1) (person requesting reexamination may submit "prior art consisting of patents or printed publications

---

[4]    On December 17, 2012, after the briefing on ThyssenKrupp's motion was complete, ThyssenKrupp submitted a letter, without leave of court, containing additional citations to authority that were available to ThyssenKrupp at the time it filed its initial motion papers. (ThyssenKrupp Dec. 17, 2012 Letter). District of Delaware Local Rule 7.1.2(b) states that after the reply is filed, "no additional papers shall be filed absent Court approval," with an exception for "the citation of subsequent authorities." L.R. 7.1.2(b). ThyssenKrupp's submission is not the type of "subsequent authority" allowed under Local Rule 7.1.2(b), and it will therefore be disregarded. Even if this submission was considered, however, the Special Master notes that the letter's central argument, that it is "not for the courts to say what information should be submitted to the Patent Office in a reexamination proceeding," is belied by ThyssenKrupp's stated need for such information and its stated reason to modify the Protective Order – i.e., the "information at issue is relevant to reexamination of the patents-in-suit." (D.I. 200 at 9).

[5]    There is no "presumptive right of public access" to "discovery motions and their supporting documents," such as the materials at issue here. *Leucadia, Inc. v. Applied Extrusion Techs., Inc.*, 998 F.2d 157, 164-65 (3d Cir. 1993). ThyssenKrupp does not argue otherwise.

which that person believes to have a bearing on the patentability of any claim of a particular patent"); 37 C.F.R. § 1.552(a) ("Claims in an *ex parte* reexamination proceeding will be examined on the basis of patents or printed publications"); 37 C.F.R. § 1.552(c) ("Issues other than those indicated in paragraphs (a) [prior art patents and publications] and (b) [no enlargement of claim scope during reexamination] . . . will not be resolved in a reexamination proceeding").

Inventio further argues that once the request for reexamination is granted, there is only one type of additional information that the USPTO may consider: a "statement of the patent owner and accompanying information submitted pursuant to § 1.501(a)(2)." *See* 37 C.F.R. § 1.552(d) (noting that "statement[s] of the patent owner" may be considered "after a reexamination proceeding had been ordered"). In order to qualify as a "statement of the patent owner" under 37 C.F.R. § 1.501(a)(2), at least the following requirements must be met:

- The statement must be "filed by the patent owner in a proceeding before a Federal court or the [USPTO]"; and

- In the statement, "the patent owner took a position on the scope of any claim of the patent."

*See also* 35 U.S.C. § 301 (any person may cite to the USPTO: "(1) prior art consisting of patents or printed publications which that person believes to have a bearing on the patentability of any claim of a particular patent; and (2) statements of the patent owner filed in a proceeding before a Federal court or the Office in which the patent owner took a position on the scope of any claim of a particular patent").

Inventio asserts that the information at issue here cannot be "statements of the patent owner" because it was not "filed by the patent owner" during prosecution or in a Federal Court, and the patent owner did not "[take] a position on the scope of any claim of the patent" in those materials. (Opp. Br. at 15-16). Thus, Inventio argues that the information would not be considered during a reexamination.

In response, ThyssenKrupp argues that "Inventio's reliance on the patent owner's statement of 37 C.F.R. §1.501(a)(2) is misplaced." (D.I. 200 at 10). Rather, ThyssenKrupp relies heavily on the MPEP, which it argues is "an official interpretation of statutes or regulations" (*Id*. at 9 n.12). According to ThyssenKrupp the materials at issue constitute "admissions of the patent owner," which may be used in determining whether to grant a request for reexamination and in the reexamination itself. (*Id* at 9-10); *see also* MPEP § 2258(I)(F)(1). ("Thus an admission, *per se*, may not be the basis for establishing a substantial new question of patentability. However, an admission by the patent owner of record in the file or in a court record may be utilized in combination with a patent or printed publication."); MPEP § 2258(I)(F)(2) ("Admissions by the patent owner in the record as to matters affecting patentability may be utilized in a reexamination proceeding. . . . The admission . . . may be presented during the pendency of the reexamination proceeding or in litigation."); 37 C.F.R. § 1.104(c)(3) ("In rejecting claims the examiner may rely upon admissions by the applicant, or the patent owner in a reexamination proceeding, as to any matter affecting patentability . . ."). ThyssenKrupp asserts that the "admissions" discussed in the MPEP are "simply different" than the "statements" discussed in the statutes and regulations. (D.I. 200 at 10).

Inventio responds that ThyssenKrupp's MPEP citations are "misleading" and "out-of-date." Specifically, Inventio asserts that the MPEP, which was last revised in August 2012, has been superseded by the provisions of the America Invents Act ("AIA") cited by Inventio (35 U.S.C. § 301(a)(1), 37 C.F.R. § 1.552(d), and 37 C.F.R. § 1.501(a)(2)), which became effective September 16, 2012 (*i.e.*, one year after passage of the AIA). According to Inventio, the USPTO no longer accepts "admissions" unless they meet the strict requirements of "statements" under the U.S. Code and regulations.

Inventio further argues that even if the cited sections of the MPEP do apply, the deposition transcripts and documents at issue here do not constitute "court record[s]" because they were not filed with the court. In response, ThyssenKrupp asserts that "court record[s]" encompass "depositions . . . and other documents that resulted in the litigation." (Oral Argument Tr. at 9:4-10). Although neither party was able to cite a case that addressed the issue of "court record[s]," ThyssenKrupp notes that "Inventio had recently been involved in two reexaminations involving one of its patents, where it took a broad view of the types of material that can be submitted in a reexamination proceeding." (D.I. 226 at 2).

During oral argument and in its supplemental briefing, ThyssenKrupp also raised a new MPEP section, § 2001.06(c), and argued that "Inventio and its representative have a duty to bring certain information to the attention of the Patent Office, which includes discovery 'interrogatories, depositions, and other documents and testimony.'" (D.I. 226 at 4).

Inventio responds that:

(1)     35 U.S.C. § 301(a) is not a permissive statute, and thus "the categories of information listed in § 301(a) are the **only** types of information that a third party requestor may submit" (Inventio's Response To ThyssenKrupp's Supplement To Its Motion To Declassify ("Res. to Suppl. Br.") at 2) (emphasis in original);

(2)     The information that Inventio submitted in its two other reexaminations was ignored by the USPTO (*id.* at 4-7); and

(3)     MPEP § 2001.06(c) "only creates a duty to disclose litigation materials **'by the applicant'** or, in a reexamination, by the patent owner" and only "requires submission[s] of litigation materials **to the extent that they are 'material.'**" (*Id.* at 8-10) (emphasis in original).

b)     The Importance of the Materials to Reexamination

The Special Master will now attempt to sort through this tangle of statutes, regulations, and manuals. Although Inventio focuses on 35 U.S.C. § 301, this statute is not specifically limited to reexamination requests or substantive reexaminations. Indeed, it is a disclosure statute that allows "any person" at "anytime" to cite prior art, and after passage of the AIA, "statements of the patent owner" to the USPTO. "Anytime" means "any time during the period of enforceability of the patent," and not just reexamination. *See* 37 CFR § 1.501.

As noted previously, there are two stages to a reexamination: the initial stage in which the USPTO reviews the submitted prior art and determines whether to grant a request for

reexamination of a particular patent, *see* 35 U.S.C. §§ 302-03; and the substantive stage where if the USPTO determines that a substantial new question of patentability is raised, the patent is reexamined to determine its validity, *see* 35 U.S.C. §§ 304-05.

Before and after September 16, 2012 (when the relevant sections of the AIA became effective), 35 U.S.C. § 302 has governed the types of information that can be submitted to the USPTO as part of the request for reexamination. The pertinent part of this statute changed little after the AIA, as shown below (cross outs are the deletions and underlines are the additions):

> Any person at any time may file a request for reexamination by the Office of any claim of a patent on the basis of any prior art cited under the provisions of <u>section 301</u> ~~of this title~~.

The definition of "prior art" under § 301, as incorporated by reference into 35 U.S.C. § 302, also did not substantively change after the AIA. It has always been defined as "patents or printed publications." 35 U.S.C. § 301(a). Similarly, the relevant portion of 37 C.F.R. § 1.510, which governs the request for *ex parte* reexamination, has not substantively changed after the AIA. This regulation has always stated that any person may file a request for an *ex parte* reexamination "on the basis of prior art patents or printed publications." 37 C.F.R. § 1.510(a). Thus, the AIA did not substantively change what can be submitted as part of a request for reexamination.

Consistent with 35 U.S.C. § 302, the MPEP, which was last updated in August 2012, states that "a request for reexamination is limited to prior art patents and printed publications." (MPEP § 2258(I)(F), D.I. 201 at A146). However, the MPEP also allows "admissions of the patent owner" to be used "in combination with a patent or printed publication" to determine whether there is a new question of patentability – the threshold requirement for granting a reexamination request. These "admissions" cannot establish "a substantial new question of patentability" by themselves. Rather, they must be used in connection with a printed publication or patent.

Although the parties dispute whether the USPTO still considers "admissions" in deciding whether to grant a reexamination request, it is undisputed that before September 16, 2012 such "admissions" were analyzed in a reexamination request, along with prior art patents and printed publications, in determining whether there was a substantial new question of patentability. Because the statutory scheme governing requests for reexamination did not substantively change after the AIA, the Special Master believes that the rules governing the use of "admissions" in requesting reexamination as discussed in the MPEP still apply after September 16, 2012. Inventio cites to no case law or legislative history that would suggest that Congress had any intention of changing how admissions were used in requests for reexamination.[6]

---

[6]     The Special Master finds unpersuasive Inventio's argument that § 301(a) is not permissive, and thus contains the only types of information that a third party can submit in a reexamination. (Res. to Suppl. Br. at 1-4). Before and after the AIA, the definition of prior art in § 301(a) remained the same, and it is undisputed that the USPTO

This conclusion is supported by the recent amendments that the USPTO made to the MPEP in August 2012.  At that time, the USPTO was undoubtedly aware that the AIA provisions (including the new provisions of 35 U.S.C. § 301) would become effective in a month (September 2012).  However, the USPTO did not eliminate the sections of the MPEP discussing use of admissions in requesting reexamination.  Instead, the USPTO amended the specific requirements for when such admissions can be used in a reexamination request.  For instance, Section 2217(III) of the MPEP was amended as follows in August 2012 (as the Instructions for Revision 9 of the MPEP explain "[a]dditions to the text of the Manual are indicated by arrows (><) inserted in the text"):

> A third party, however, may not submit admissions of the patent owner made outside the record of the file or court record > , unless such admissions were entered into a court record.  If an admission made outside the record of the file or the court record is entered into a court record and a copy thereof is then filed in a reexamination (as a copy of a paper filed in the court), such paper could be admitted pursuant to MPEP § 2282; however, such would not be given weight as an admission with respect to use in establishing a substantial new question of patentability, or as a basis in rejecting claims.  <  Such a submission would be outside the scope of reexamination.

This change, made a month before the AIA provisions took effect, would make little sense unless admissions were still a part of the reexamination request after the AIA took effect.

The Special Master next examines whether these "admissions" would be considered, along with prior art, during the substantive stage of reexamination to determine the validity of the patent.

"After reexamination has been ordered, the examination on the merits is dictated by 35 U.S.C. § 305. . ."  MPEP § 2258.  This statute has also changed little since the passage of the AIA.  It provides that reexamination proceedings will be "conducted according to the procedures established for initial examination[s]."  35 U.S.C. § 305.

It is undisputed that prior to the passage of the AIA, the USPTO considered "admissions of the patent owner," along with prior art, in determining the validity of the reexamined patent during the substantive stage of the reexamination.  *See* MPEP § 2258(I)(F) ("admissions by the patent owner as to matters affecting patentability may be utilized in a reexamination proceeding. . . Accordingly, a proper evaluation of the scope and content of the prior art in determining obviousness would require a utilization of any 'admission' by the patent owner which can be used to interpret or modify a patent or printed publication applied in a reexamination proceeding.").  Indeed, 37 C.F.R. § 1.104(c) made clear that in rejecting claims, "an examiner may rely upon admissions by . . . the patent owner in a reexamination proceeding, as to any matter affecting patentability . . .").  Importantly, this regulation has not changed after the passage of the AIA.  *See* Federal Register Volume 77, Number 151.  Because this regulation

---

considered admissions in conjunction with prior art before the AIA.  There is no evidence that the AIA made § 301(a) more restrictive than it was before.

is still in effect (and clearly states that an examiner can rely on admissions during a reexamination), the only logical conclusion is that admissions can still be used in a reexamination proceeding.

This conclusion is supported by the legislative history of the AIA.  The parties do not dispute that prior to the AIA, the USPTO considered prior art patents and printed publications, as well as admissions of the patent owner, during an *ex parte* reexamination.  When the AIA provisions went into effect on September 16, 2012, the USPTO was allowed to consider one additional piece of information during reexamination, i.e., "statements of the patent owner filed in a proceeding before a Federal court or the Office in which the patent owner took a position on the scope of any claim of a particular patent."  *See* 35 U.S.C. § 301.  Thus, the AIA did not restrict the types of information (such as "admissions of the patent owner") that the USPTO traditionally considered during reexamination.   Rather, the AIA expanded what can be considered.  *See* Federal Register Volume 77, Number 151 ("The Leahy-Smith America Invents Act (AIA) expands the scope of information that any party may cite in a patent file to include written statements of a patent owner filed in a proceeding before a Federal court or the [USPTO] . . . ) (emphasis added).  As Inventio described, "House Report 112-98 (June 1, 2011), which is the House Judiciary Committee report in support of the America Invents Act, notes that the Act 'expands the category of documents that may be cited [by a third party] in a reexamination proceeding to include written statements of the patent owner' which qualify under 35 U.S.C. § 301(a)(2). *Id.* at 46." (Res. to Suppl. Br. at 3) (emphasis added).  Because the legislative history suggests that the AIA expanded rather than restricted what information can be considered in reexamination, it makes sense that "admissions of the patent owner" can still be considered.

This conclusion is also supported by the recent amendments made to the MPEP in August 2012.  Similar to the amendments to Section 2217(III) of the MPEP discussed above, one month before the AIA provisions became effective (including the new provisions of 35 U.S.C. § 301 discussing "statements of the patent owner"), the USPTO, rather than eliminate the use of admissions in reexamination, amended Section 2258(I)(F) of the MPEP to more precisely define when such admissions can be used (additions are indicated by arrows (><)):

> A third party, however, may not submit admissions of the patent owner made outside the record > of the file or the court record < .  Such a submission would be outside the scope of reexamination.

(D.I. 201 at A147).  Like the change to Section 2217(III) of the MPEP, this change would make little sense unless admissions were still part of the reexamination process after the AIA took effect.

The Special Master also agrees with ThyssenKrupp that the "admissions" discussed in the MPEP and 37 C.F.R. § 1.104(c) are different than the "statements" discussed in the AIA.  Although similar, the key differences between the two include the following:

| STATEMENTS | ADMISSIONS |
|---|---|
| Can be submitted at any time during the period of enforceability of the patent<br><br>(35 U.S.C. § 301, 37 CFR § 1.501) | Can only be submitted during one of the two stages of reexamination<br><br>(MPEP § 2258(I)(F), 37 C.F.R. § 1.104(c)) |
| Cannot be used in requesting reexamination<br><br>(35 U.S.C. §§ 301, 302) | Can be used in requesting reexamination and in the reexamination itself<br><br>(MPEP § 2258(I)(F), 37 C.F.R. § 1.104(c)) |
| Can be considered by themselves<br><br>(35 U.S.C. § 301) | Can only be considered in conjunction with prior art patents or printed publications<br><br>(MPEP § 2258(I)(F)) |

The Special Master must now determine whether the information at issue is either a "statement" or an "admission." The Special Master agrees with Inventio that the cited deposition transcripts and Singapore patent application are not "statements" as defined by the U.S. Code and Federal Regulations. *See* 35 U.S.C. § 301(a)(1), 37 C.F.R. § 1.552(d), and 37 C.F.R. § 1.501(a)(2). Specifically, these materials were not "filed by the patent owner" with the Court, and do not involve Inventio "taking a position on the scope of any claim of the patent[s]." ThyssenKrupp does not argue otherwise. At oral argument ThyssenKrupp stated that some of these materials concerned the "commercial success" of the invention, which has nothing to do with the "scope of any claim of the patent[s]." (Oral Argument Tr. at 37: 16-21 ("some of these documents that I'm asking be either declassified or permitted to submit are in there is to rebut potential argument that Inventio might make about commercial success and other secondary factors")).

Are they "admissions" under the provisions of the MPEP and CFR? For the reasons stated below, the Special Master concludes that the USPTO is not likely to consider these materials "admissions" if submitted by ThyssenKrupp.

Admissions in a request for reexamination are governed by MPEP § 2217(III). Acceptable admissions can take many forms. They can "reside in the patent file (made of record during the prosecution of the patent application) or may be presented during the pendency of the reexamination proceeding or in litigation." MPEP § 2217(III). Such admissions, however, must be found "in the file or in a court record" and can only be "utilized in combination with a patent or printed publication." *Id*.

The parties dispute whether these materials are "[i]n a court record." ThyssenKrupp asserts that a "court record" includes "depositions . . . and other documents that resulted in the litigation." (Oral Argument Tr. at 9:6-10). Inventio, on the other hand, asserts that a "court record" is limited to what is actually filed with the Court. (*Id*. at 11:14-12:8). The provisions of the MPEP shed some light on this dispute.

22

The MPEP treats "admissions" submitted during the substantive stage of the reexamination differently depending on who submits them.  Section 2282 of the MPEP, which is a notification provision requiring the patent owner to provide notice to the USPTO of any prior or concurrent proceedings in which the patent undergoing *ex parte* reexamination is or was involved, states that a third party may not ordinarily make any "submissions of any kind" once the request for reexamination has been ordered, except for providing "copies of notices of suits and other proceedings involving the patent and copies of decisions or papers filed in the court from litigations or other proceedings involving the patent."  MPEP § 2282 (emphasis added). Moreover, "papers filed in the court from litigations . . . will not be entered into the record (and will be expunged entirely) if they provide a party's arguments."  *Id.*  Thus, the USPTO would expunge any material submitted by a third party during a reexamination that is not "filed with the court" or contains a party's arguments.  Based on this, it seems logical that a "court record" as defined by Section 2258(I)(F) of the MPEP does not include the types of information at issue here, which were not "filed in the court" in any papers besides the instant motion.

Section 2217 of the MPEP, which governs requests for reexaminations, similarly treats admissions submitted as part of a reexamination request differently depending on who submits them.  According to MPEP § 2217(III), "[a]ny admission submitted by the patent owner is proper.  A third party, however, may not submit admissions of the patent owner made outside the record of the file or the court record, unless such admissions were entered into a court record." MPEP 2217.  There is only one exception to this rule, if the admission outside the court record is "entered into a court record . . . (as a copy of a paper filed in the court)," in which case the paper could be admitted pursuant to MPEP § 2282 to provide notice of a prior or concurrent proceeding on the same patent.  MPEP § 2217(III) (emphasis added).  However, such a submission "would not be given weight as an admission with respect to use in establishing a substantial new question of patentability, or as a basis in rejecting claims.  Such a submission would be outside the scope of reexamination."  *Id.*  Because Section 2217 of the MPEP makes a distinction between papers that are filed with the court and papers that are not, it seems clear from a plain reading of the MPEP that a "court record" according to that Section can only consist of those papers that are actually filed with the court.

Because ThyssenKrupp is the party seeking to submit these materials, and these materials were clearly made outside the official court record and later placed in the court record by ThyssenKrupp in the motion papers currently being decided, the USPTO would likely not consider these "admissions" in reviewing a request for reexamination.  MPEP § 2217(III). Moreover, if ThyssenKrupp were to submit its motion papers containing these materials under MPEP § 2282, not only would the information "not be given any weight as an admission with respect to use in establishing a substantial new question of patentability, or as a basis in rejecting claims," the papers would "not be entered into the [reexamination] record" because they are "litigation papers" containing "a party's arguments."  *See* MPEP § 2282 ("papers filed in the court from litigations or other proceedings involving the patent will not be entered into the record (and will be expunged if already entered) if they provide a party's arguments, such as a memorandum in support of summary judgment").

Similarly, these materials would likely not be considered "admissions" during the reexamination itself.  Although "[a]ny admission by the patent owner is proper" during a reexamination, a third party such as ThyssenKrupp "may not submit admissions of the patent

owner made outside the record of the file or the court record.  Such a submission would be outside the scope of reexamination."  MPEP § 2258(I)(F).  As noted above, these materials consist of statements made in deposition transcripts and in a foreign patent application – i.e., they were made "outside the court record."  Thus, the materials would not be "admissions" if submitted by ThyssenKrupp.

ThyssenKrupp argues for a "broad reading of the scope of litigation-related information permitted by MPEP §2258" because of Inventio's involvement in two reexaminations involving a different patent in which Inventio allegedly "took a broad view of the types of material that can be submitted in a reexamination proceeding." (D.I. 226 at 2-4).  Specifically, Inventio submitted litigation-related information that was not filed with the court, including expert reports and discovery responses.  *Id*.  This argument misses the mark.  MPEP §§ 2217 and 2258 make a clear distinction between information that is submitted by the patent owner ("[a]ny admission submitted by the patent owner is proper") and that submitted by a third party ("[a] third party, however, may not submit admissions of the patent owner made outside the record of the file or the court record. . .").  Thus, the fact that Inventio (as the patent owner) submitted litigation documents not filed with the court in an unrelated reexamination, has no bearing on whether the USPTO would consider such information if submitted by ThyssenKrupp (as a third party) in a different reexamination.

Lastly, the Special Master finds unpersuasive ThyssenKrupp's argument that this type of information can otherwise be submitted by a third party under MPEP § 2001.06(c).  (D.I. 226 at 4).  As Inventio correctly points out, MPEP § 2001.06(c) only creates a duty to disclose litigation materials "by the applicant."  It does not authorize a third party, such as ThyssenKrupp, to submit such materials.

For these reasons, the Special Master finds that the information at issue would likely not be considered by the USPTO if ThyssenKrupp submitted it as part of a request for an *ex parte* reexamination.  Thus, ThyssenKrupp's stated need to submit this information to the USPTO should be given little weight.

## 2.  The Harm of Disclosure

It has already been determined that good cause exists to protect the information in Categories 3, 14, 22, 23, 24, 25, and 31.  Judge Robreno refused to enter the protective order as originally proposed by the parties.  (D.I. 25).  It was only after the parties revised the protective order to specifically set forth the categories of information that "adhere[d] closely to the principles set forth by the Third Circuit" in *Pansy* that the order was granted.  (*Id.*).  In granting the proposed Protective Order, the Court necessarily found that "good cause exists to protect this information from public disclosure."  (D.I. 30 at 1).  Thus, the Court has necessarily determined that Inventio would be harmed by the disclosure of this information.[7]

---

[7]     ThyssenKrupp does not seek modification of the <u>categories</u> identified in Paragraphs 1.2(a) or 1.2(b) of the Protective Order and does not contest the Court's previous finding of good cause to protect the information listed in those paragraphs.  Paragraphs 3.1 and

3.      <u>**Good Cause Analysis**</u>

Because the USPTO is likely to disregard the information if it is submitted by ThyssenKrupp as part of a request for *ex parte* reexamination, *Pansy* factors 2 (whether the information is being sought for a legitimate purpose), 6 (whether the party benefitting from the order is a public entity or official) and 7 (whether the case involves issues important to the public) weigh in favor of protecting the confidentiality of the information.   Similarly, *Pansy* factor 4 (whether the information to be disclosed is important to public health or safety) favors nondisclosure because this case involves a dispute between two private entities, and the infringement or non-infringement of the patents-in-suit will not cause foreseeable harm to the public.   *See Crum & Crum*, 2011 WL 886356, at *4 (finding *Pansy* factor 4 favored nondisclosure because the parties "are not public officials or public entities, and there is no evidence that breach of the agreement will cause harm to the public").   *Pansy* factor 1 (whether disclosure will violate any privacy interests) favors disclosure because Inventio is a business entity, and "[u]nlike individuals, who have a general right to privacy, business entities do not have a right to privacy."  *Id.* at *3.   *Pansy* factor 3 (whether disclosure will cause embarrassment to a party) also favors disclosure because, as the court in *Crum & Crum* explained, "embarrassment is generally a non-monetized harm to an individual."  *Id.* at *4.  Thus, "it may be especially difficult for a business enterprise, whose primary measure of well-being is presumably monetizable, to argue for a protective order on this ground."  *Pansy*, 23 F.3d at 787. This factor weighs in favor of disclosure because Inventio does not identify any form of embarrassment that it would suffer if its information is made public.   *Pansy* factor 5 (whether sharing the information among litigants will promote fairness and efficiency) is not relevant here because the reclassification and modification that ThyssenKrupp seeks does not involve sharing of information among litigants.

There is an additional factor that courts ordinarily consider when deciding whether to modify an existing Protective Order:  "the reliance by the original parties on the confidentiality order."  *Pansy*, 23 F.3d at 790.  Although Inventio does not specifically argue that it relied on the original confidentiality order to its detriment, it argues that the parties "specifically bargained for" the treatment of the information identified in the Protective Order as Highly Confidential. (Opp. Br. at 6).  Thus, this factor favors nondisclosure.

With this backdrop, the Special Master concludes under the *Pansy* analysis that ThyssenKrupp has not met its burden to prove that the Protective Order should be modified to allow the submission of this information to the USPTO under seal pursuant to MPEP § 724.02. Specifically, the Special Master concludes that ThyssenKrupp's need for the information is outweighed by the harm to Inventio should the information be submitted under seal.  First, as previously noted, ThyssenKrupp's stated need for this information is low, given that it is unlikely that the USPTO would consider the information during an *ex parte* reexamination.  Second, the Court has already determined that good cause exists to protect this information from disclosure

---

3.2 of the Protective Order, which govern challenges to confidentiality designations, do not provide a mechanism to challenge the categories themselves, but rather only permit challenges as to whether particular information actually falls within those categories. (D.I. 30).

when it entered the Protective Order.  (D.I. 30).  In doing so, the Court necessarily found that Inventio would be harmed by the disclosure of such information.  This harm would not be substantially alleviated if the information was submitted to the USPTO pursuant to MPEP § 724.02.  As Inventio points out, if a portion of the submitted information is deemed material to patentability, all the information becomes a "permanent part of the reexamination file and open to the public," even though the Court has already determined that such information is properly confidential.  MPEP § 724.04(c)(C); (Opp. Br. at 17-18).  Even in the unlikely event that this information is deemed material by the USPTO, the importance of this information to the reexamination (and by proxy the stated importance of the public in "purging invalid patents") does not outweigh the harm to Inventio caused by public disclosure.[8]

## CONCLUSION

The Special Master concludes Inventio has not met its burden of proving that the information in Categories 1, 2, 4, 5, 6, 7, 9, 10, 11, 12, 13, 15, 16, 17, 19, 20, 21, 26, 27, 28, 29, 30, 32, and 33 is Highly Confidential or Confidential.  Thus, this information should be reclassified as non-confidential.  The Special Master also finds that the information in Categories 3, 14, 22, 23, 24, 25, and 31 was properly marked as Highly Confidential under the Protective Order.  As such, the harm to Inventio should this information be disclosed outweighs ThyssenKrupp's purported need for the information.  Thus, the Special Master finds that good cause exists to protect this information, and denies ThyssenKrupp's request to modify the Protective Order.

Accordingly, ThyssenKrupp's Motion to Reclassify as Non-Confidential Information Improperly Designated by Plaintiff as Highly Confidential and/or For Limited Modification of the Protective Order is GRANTED IN PART and DENIED IN PART.

Dated: January 22, 2013                          /s/ *Collins J. Seitz, Jr.*
                                                 Collins J. Seitz, Jr.
                                                 Special Master

---

[8]     The Special Master does not find persuasive ThyssenKrupp's argument that it is "impossible" for Inventio to be harmed if the information is submitted to the USPTO and the USPTO deems it "material to reexamination" because "Inventio must itself disclose such material information to the USPTO in the reexamination."  (D.I. 200 at 10).  It is the patentee's, and not a third party's, duty to disclose information that it knows to be material during a reexamination.  *See* 37 C.F.R. § 1.56(a).  Inventio has made a determination that this information is immaterial to the proposed reexamination.